**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:22-cr-0062 (JMC)** |
| **v.** | : | |
| | : | |
| **RAECHEL GENCO,** | : | |
| | : | |
| **Defendant.** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Raechel Genco to 30 days of home confinement, a three-year term of probation, 60 hours of community service, and $500 in restitution.

**I.      Introduction**

Defendant Raechel Genco participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.7 million dollars in losses.[1]

---

[1] Although the Statement of Offense in this matter, filed on June 24, 2022, (ECF No. 65 at ¶ 6) reflects a sum of more than $1.4 million dollars for repairs, as of April 5, 2022, the most recent assessment of loss information revealed the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Defendant Genco pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(D). As explained herein, a sentence of 30 days of home confinement, three years of probation, 60 days of community service, and $500 in restitution is appropriate in this case.  Although Genco's conduct is not free from aggravating factors, it falls at the lower end of culpability for January 6 cases. Genco did not enter the Capitol or directly confront law enforcement. She did, however, have the clearest possible notice that public access to the Capitol grounds was prohibited and nevertheless followed a crowd that breached barriers to those grounds through a violent confrontation with police. Through her plea agreement, Genco has accepted responsibility for her actions; however, she is not in the category of defendants who expressed an early intention to resolve her case, and to date, Genco has not affirmatively expressed remorse for her conduct.

The Court must also consider that Genco's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who trying to prevent a breach of the Capitol Building, and disrupt the proceedings. *See United States v. Thomas Fee*, 1:21-cr-00131 (JDB), Tr. 04/01/2022 at 17 ("The defendant was an active participant in a mob assault on our core democratic values and our cherished institution. And that assault was intended by many and by the mob at large in general to interfere with an important democratic processes of this country. I cannot ignore that, cannot pull this misdemeanor out of that context.") (statement of Judge Bates). The defendant's actions and those of her fellow rioters enabled the breach of the Capitol, threatened the lives of the police officers, legislators and their staffs, and disrupted the certification vote for several hours. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they

had the safety of numbers.") (statement of Judge Chutkan).  The facts of and circumstances of Genco's offense conduct support a sentence of three years' probation in this case

## II.      Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 65 (Statement of Offense), at ¶¶ 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent— contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to Genco's conduct and behavior on January 6.

### *Defendant Genco's Role in the January 6, 2021 Attack on the Capitol*

Defendant Genco planned to travel from her home in Pennsylvania to the Save America rally on the Ellipse with her partner, defendant Ryan Samsel.[2]  On January 6, Genco and Samsel attended the rally, and before its conclusion, they joined a crowd walking towards the U.S. Capitol. As they walked together, Samsel carried a large flag depicting former president Trump as the film character "Rambo."

---

[2] Samsel is charged with four codefendants in Case No. 21-cr-537 (JMC). He confronts numerous felony offenses, including assault in violation of 18 U.S.C. § 111(a)(1) and (b), civil disorder, in violation of 18 U.S.C. § 231(a), entering and remaining in restricted grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A), disorderly and disruptive conduct in a restricted area with a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A), engaging in physical violence in a restricted area in violation of 18 U.S.C. § 1752(a)(4) and (b)(1)(A) and (B), and obstruction of justice, in violation of 18 U.S.C § 1512(c)(2).  He is also charged with misdemeanors under 40 U.S.C. § 5104(e).

3



*Figure 1*



*Figure 2*

By approximately 12:45 p.m., Genco and Samsel joined a large crowd gathered at the Peace Monument located in a roundabout at Pennsylvania Avenue, N.W. and 1st Street, N.W., commonly referred to as the Peace Circle.  Members of the crowd at the Peace Circle shouted "1776" and chanted "USA!"  Genco and others, with Samsel taking the lead, then moved southeast along the sidewalk (commonly referred to by U.S. Capitol Police Officers as the Pennsylvania Avenue walkway) that connects the Peace Circle to the U.S. Capitol building.   The crowd walked over barricades designed to close the sidewalk access to and maintain a buffer zone from the U.S.

Capitol Grounds perimeter fence line. This fence line was intended to keep the public away from the Capitol building and the Congressional proceedings underway inside.

The fence line was manned by uniformed and armed U.S. Capitol Police ("USCP") officers and was constructed with metal bike rack barriers, physically linked end to end, and reinforced with dark plastic mesh safety fencing attached behind the metal bike racks. The fencing clearly displayed large white "AREA CLOSED" signs with bold red lettering.  As shown in the photographs below, these signs were visible to Genco.  Figure 3 is a screenshot obtained from a recording in Genco's phone.  In Figure 4, Genco appears beneath a red arrow approaching the barrier manned by police officers.



*Figure 3*



*Figure 4*

Samsel, seen from behind against the barrier above, and wearing a red cap and blue denim jacket over a white hooded sweatshirt, led the crowd to the barricade as Genco followed; he no longer carried the flag from the rally, leaving his hands free.  Instead, Genco carried the flag during the approach to the barricade, as shown in the photograph below:



*Figure 5*

Samsel arrived at the police line at approximately 12:50 p.m. and grew increasingly agitated as he confronted police. Samsel assumed an aggressive posture, removed his blue denim jacket, and made a series of attempts to tear down the bike racks. He smashed a bike rack to the ground. Other members of the crowd began to attack other portions of the barrier and fight with officers.[3] The barrier was eventually leveled and officers were forced to retreat as the crowd surged past. Genco also approached the Capitol.

Samsel was again among the first to arrive at the West Front, where officers had been forced to retreat and where they established new barriers and a defensive line. Open-source videos capture Genco, after she arrived at the West Front, carrying Samsel's flag and his denim jacket. The still photograph below is taken from a video that recorded Genco at the West Front as she appears to search for Samsel.

---

[3] Officers were injured during this assault; one of the officers suffered a concussion and traumatic head injury with continuing effects.



*Figure 6*

Assaults against police officers on the West Front of the Capitol Grounds made the rioters' subsequent entry into the United States Capitol Building on January 6, 2021, possible. Initiated by the most fervent smaller groups and individuals within the crowd and using the mob itself as a cloak for their actions, each blow helped the crowd penetrate further into the USCP's defenses until the building itself was accessible and the occupants were at risk. Because many of the thousands of people surrounding the officers were not engaged in assaultive conduct, it was difficult for officers to identify individual attackers or defend themselves. The physical breaches of the building can therefore be traced directly back to the assaultive conduct on the grounds of the West Front.

Genco remained at the West Front as the area filled with rioters and as the police presence increased. As she stayed, at times with Samsel by her side and at times without him, Genco could not have overlooked the clamor of an angry mob, or police efforts to disperse the mob that included

the use of chemical irritants, flash bangs, and non-lethal projectiles.  Genco was present at the West Front before, during, and after the arrival of Metropolitan Police Department ("MPD") officers who came to reinforce the USCP.  The photograph below shows Genco, to the left of a red arrow, in front of a line of USCP officers in riot gear.



*Figure 7*

Genco also appears in an open-source video where she watched as Samsel "moons" the line of officers.  Genco smiled at the insult towards the police, depicted below.



*Figure 8*

Soon after the images above were captured, one of many physical altercations erupted between rioters and nearby officers. While some rioters engaged in direct physical violence against officers, others sent projectiles flying towards police. Rioters and police both sprayed each other with chemical irritants. Genco has acknowledged that she was in an area where tear gas was deployed, and that she remained in that area for almost an hour and a half. PSR ¶ 22.[4] Samsel, located in the photos below with a yellow arrow, attempted to move towards the altercation, indicated with green arrows. He then retreated, apparently because he was hit with chemical spray, and returned to Genco's side. While Genco did not approach the violence, she almost certainly observed some of it that occurred in near proximity to her.

---

[4] Data obtained from Genco's phone for images of Genco at the West Front place Genco in that location from at least 1:00 p.m. until at least 2:35 p.m.



*Figure 9 [Genco is out of the frame to the left]*



*Figure 10 [Samsel, to the left of Genco, reacts to spray as Genco observes]*



*Figure 11 [Samsel retreats towards Genco]*

Samsel was able to physically confront officers on the West Front unencumbered by any of the items Genco held for him.  An example appears below:



*Figure 12*

And Genco returned the "Rambo" flag to Samsel when he chose to brandish it at MPD officers like a potential weapon.



*Figure 13*

Genco remained in the area of the West Front for over an hour before leaving the restricted Capitol grounds.  According to data recovered from Genco's cellular phone, at 2:35 p.m., Samsel and Genco recorded themselves standing near the West Front in a celebratory crowd.  In the video, Samsel announces that "We breached the Capitol" and in response, Genco cheers.  A screenshot from the video is shown below.



*Figure 14*

On the morning of January 7, 2021, Genco and Samsel exchanged messages about the attack on the Capitol, as follows:

SAMSEL:     Ppl don't know the usa was founded by ppl like us

            It was

GENCO:      And they are out for there own self.  What a shame

SAMSEL:     We got guns and fought them

            It made world news

GENCO:          That's right!!

SAMSEL:         Just to know I was on the front lines makes me proud I got them moving in

                I love the horn and ppl screaming charge

                I wana huge [*sic*] all of them

GENCO:          I am proud of you so much and see how much you would sacrifice your life
                for this country…You are amazing ♡

                                    …

GENCO:          It was a great experience yesterday and it made me open my eyes and
                understand more … Just watching you and seeing what you did was
                absolutely amazing.  And I am lucky to have you in my life and love you
                even more ♡      ♡  … Just know if you had to go to war with these
                people, I will always be by your side and support you all the way through
                this.

*The Charges and Plea Agreement*

On February 12, 2021, the United States charged Raechel Genco by criminal complaint

with violating 18 U.S.C. §§ 1752(a)(1) and (a)(2).  ECF 1. On February 27, 2021, law enforcement

officers arrested her in Pennsylvania. ECF 12.  On February 28, 2022, the United States charged

Genco in a two-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (a)(2).  ECF 53. The

United States filed a one-count Superseding Information on June 24, 2022 charging Genco with

violating 40 U.S.C. § 5104(e)(2)(D). On June 29, 2022, pursuant to a plea agreement, Genco

pleaded guilty to the Superseding Information, charging her with a violation of 40 U.S.C. §

5104(e)(2)(D), which makes it a crime to "utter loud, threatening, or abusive language, or engage

in disorderly or disruptive conduct, at any place in the Grounds or in any of the Capitol Buildings".

ECF 65, 66. In her plea agreement, Genco agreed to pay $500 in restitution to the Department of

the Treasury.  ECF 66:6; PSR ¶¶ 20, 61.

**III.    Statutory Penalties**

Genco now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(D). As noted by the plea agreement, Genco faces up to six months of imprisonment, five years of probation, and a fine of up to $5,000.  ECF 66:1. Genco must also pay restitution under the terms of her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).  As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9; PSR ¶ 24.

## IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of 30 days of home confinement, three years of probation, 60 hours of community service and $500 in restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 was a crime unparalleled in American history and defies comparison to other violent riots. It represented a grave threat to our democratic norms and practices. Indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants.

While each defendant must be sentenced based on their own conduct, this Court should take into account that each person who entered the Capitol on January 6 without authorization did

so under extreme circumstances. As they entered the Capitol, they very likely crossed through numerous barriers and barricades and heard the violent outcries of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting between the rioters and police and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while assessing Genco's individual conduct and fashioning a just sentence, this Court should look to a number of critical aggravating and mitigating factors, including: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether, during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from police officers; and (9) whether the defendant demonstrated  sincere remorse or contrition. While these factors are not exhaustive or dispositive, they help to place each defendant on a spectrum as to their fair and just punishment. Had Genco personally engaged in violence or destruction, she would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of Genco is therefore not a mitigating factor in her misdemeanor case.

Genco breached the restricted area of the Capitol grounds.  She did so with clear knowledge that she was not supposed to enter the area.  If the explicit language on signs in front of Genco were not a sufficient prohibition against entry (which they were), the presence of barriers, commands from uniformed and armed USCP officers, the officers' physical resistance to the crowd's attempts to breach the barriers, and the use of violence by the crowd and Genco's own partner, provided indisputable notification to Genco that she and others were not supposed to enter

the Capitol grounds.  After the violent breach of barriers on the Pennsylvania Avenue walkway, Genco, with Samsel's flag and possessions, proceeded to the Capitol's West Front.  She remained in that area for over an hour, despite incidents of violence from the mob and the efforts of police to disperse the crowd with warnings, commands, chemical irritants and non-lethal projectiles. Genco supported and even celebrated Samsel's physical altercations and his disruptive and insulting behavior towards police.

The nature and the circumstances of this offense, when considered with the factors below, support a sentence of 30 days of home confinement, three years of probation, 60 hours of community service, and $500 in restitution in this matter.

### B.  The History and Characteristics of Genco

Genco has no criminal history, and has complied with the terms of her supervision.  PSR ¶¶ 8, 25-31; ECF 18, 24, 32, 50, 59, 62.  She is a college graduate with a B.A. in Art Therapy. PSR ¶ 45. She is employed as a scheduler for a medical facility and works part-time at a department store. PSR ¶¶ 48-49.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[5] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the

---

[5] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C); *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [Hodgkins] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Genco's willingness to trespass into the Capitol grounds immediately after a violent breach is concerning. So is her willingness to remain in a violent mob at the Capitol's West Front for over an hour. Her statement in the aftermath of such activity, describing her partner's far more egregious and injurious conduct as a sacrifice he made for his country is disturbing, as is her statement that if her partner had to go to war with "these people" Genco would remain by his side. Each of these details gives reason for a sentence that will deter any further misconduct. Here, the United States submits that a term of home confinement for 30 days and three years of probation will provide an appropriate measure of deterrence for a defendant who lacks any criminal history, who has also remained in compliance with all conditions of release, and who appears at the low end of the range of culpability for the breach of the Capitol.

**E. The Need to Avoid Unwarranted Sentencing Disparities**

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[6] This Court must sentence Genco based on her own conduct and relevant characteristics, but should give substantial weight to the context of her unlawful conduct: her participation in the January 6 riot. Although those like Genco convicted of misdemeanors are generally less culpable than defendants convicted of felonies, misdemeanor breaches of the Capitol on January 6, 2021, were not minor crimes. A probationary sentence should not be the default.[7] *See United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth at sentencing). Accord, *United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 (statement of Judge Friedman).

Genco has pleaded guilty to the Superseding Information, charging her with disorderly and disruptive conduct on the Capitol grounds, in violation of 40 U.S.C. § 5104(e)(2)(D). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions

---

[6] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants. That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[7] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. Avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). Because the Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of the legislative branch of the federal government, the vast size of the mob, the goal of impeding if not preventing

the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against police officers, and the large number of victims. Thus, even though many of defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the following cases offer points of comparison that may aid this Court's analysis. One way to compare Genco to others is to examine other cases where defendants had, relative to others, lesser participation in the breach of the Capitol.

For example, in *United States v. Sizer*, 21-cr-621 (CRC), the government recommended a sentence of two months' home detention and 36 months' probation. Sizer was inside the Capitol for approximately two minutes. She initially lied to the FBI about her entry, but then cooperated and was more forthcoming. She did not make any social media posts or have a criminal history. Sizer received a sentence of 12 months' probation and a $5,000 fine. The brevity of Sizer's presence inside the Capitol makes her case a reasonable comparison to this case, where Genco did not enter the Capitol at all.

In *United States v. Parks*, 21-cr-363-CJN, the government recommended a sentence of 30 days' home detention, three years' probation, 60 hours of community service, and $500 in restitution. Parks walked to the Capitol from the rally on the Ellipse, arrived after observing people climbing the walls of the Capitol, entered the building and remained inside for approximately 15 minutes, and then exited when an officer told her to. Before charges were filed, Parks agreed to an interview with law enforcement and accepted responsibility for her actions; from the outset of her case, she expressed a desire to plead guilty. She did not post her January 6 activity on social media. The court sentenced her to 24 months' probation, 60 hours' community service, and $500

24

restitution.  Parks provides a valid comparison insofar as she observed rioters scaling the walls of the Capitol, although the breach observed by Parks was less violent than what Genco observed near the Peace Circle. Parks, unlike Genco, communicated her intention to plead guilty from the start of her case; however, the recommended term of probation for Genco is longer.  More similarly to Genco, Parks had a codefendant who took more of a leadership role with respect to Parks.

In *United States v. Gallagher*, 21-cr-41-CJN, the government recommended a one-month term of home confinement, a three-year term of probation, 60 hours of community service, a fine, and $500 in restitution.  Despite evidence around him of an ongoing riot, including the conduct of others who threw chairs at police officers, Gallagher entered the Capitol and remained inside until he was arrested; however, he admonished a rioter not to throw a chair and attempted to calm others. Gallagher also demonstrated substantial contrition, consented to a voluntary interview with the FBI, and expressed an early desire to resolve his case.  Gallagher was sentenced to a term of 24 months' probation, 60 hours of community service, and a $500 fine.  In her favor, Genco never entered the Capitol; unlike Gallagher, she did not admonish or attempt to calm other rioters, has yet to show substantial contrition, and did not provide early notice of an interest in resolving her case.

In *United States v. Joshua Bustle*, 21-cr-238-TFH, the government recommended 30 day's home detention, three years' probation, 40 hours of community service, and $500 in restitution. Bustle entered the Capitol and remained inside for approximately 20 minutes, did not participate in violence or destruction, and did not post his activity on social media.  He expressed an early desire to plead guilty. The court sentenced him to 30 days' home detention, 24 months' probation, 40 hours of community service, and $500 in restitution.

Alternatively, or along with the cases described above, this Court could compare cases for defendants who never entered the Capitol, such as *United States v. Griffin*, 21-cr-92-TNM, where the government recommended a sentence of 90 days' incarceration (with credit for 20 days served), a year of supervised release, 60 hours of community service, a fine of $1,000, and $500 in restitution. Griffin was also a defendant who never entered the Capitol, although he differs from Genco in other significant ways, including his failure to qualify for acceptance of responsibility and his greater culpability. Griffin was convicted for violation of 18 U.S.C. § 1752(a)(1) following a bench trial. Like Genco, Griffin had the chance to clearly view barricades at the Capitol (in his case, on the day before the attack), and was well aware that its grounds were not open to the public. On January 6, he used a metal barricade to climb a wall and gain access to the inaugural platform on the Capitol's lower west terrace. He declared his intention to remain until "they get this door broken down," remained in the restricted area for over two hours, observed property damage and acts of violence, acknowledged that he received and violated police orders not to enter the restricted area, expressed a lack of contrition, and questioned and mocked the court's verdict following his conviction. Griffin was also an elected official at the time of his offense. He received a sentence of 14 days incarceration with credit for time served.

In *United States v. Straka*, 21-cr-579-DLF, the United States recommended a sentence of four months' home confinement, probation for a term of three years, 60 hours of community service, and $500 in restitution, for a defendant and social media influencer who live-streamed his participation in the January 6 attack. Straka joined rioters after learning of the attack on the Capitol, encouraged rioters to take an officer's shield, shouted "go go go" as rioters approached and then breached the Capitol building, and even after his departure from the Capitol, encouraged rioters to "hold the line." Straka pleaded guilty to the same offense as Genco, 40 U.S.C. §

5014(e)(2)(D).  Later, during his presentence interview, Straka expressed remorse and regret for his actions.  Straka received a sentence of 90 days in home confinement, 36 months of probation, 60 days of community service, and $500 in restitution.

In certain respects, Genco is less culpable than the defendants discussed above.  She never entered the Capitol itself or any sensitive area.  Her conduct on the Capitol grounds was that of a follower rather than a leader.  The United States has no evidence that she engaged with police directly; she did not insult, berate, or taunt officers; consistently with the offense charged against her, Genco did not commit violence against officers or property.  The United States has no evidence that Genco incited other members of the crowd or the public.  These factors weigh in favor of a lesser sentence.

Other factors are more concerning.  Genco witnessed one of the earliest and most significant breaches of the Capitol grounds—a breach which also involved significant violence and caused serious bodily injury to at least one officer.  Yet after observing this attack and police officers' resistance to the crowd's incursion, Genco still chose to trespass past the scene of that violent entry and proceed to the Capitol's West Front.  Once there, she remained for over an hour and a half despite witnessing the repeated violence of the crowd, experiencing the dispersal of tear gas, and hearing the commands from police to leave.  Through her presence and at times through affirmation, she supported the violent and disruptive conduct of her partner, Ryan Samsel.  Additionally, her own decision to remain with part of the mob impeded police officers and contributed to the chaos and disruption of a continuing riot that ultimately forced the interruption of proceedings to certify a presidential election.  After witnessing rioters overwhelm another police line at the Capitol's West Front, Genco cheered.

Unlike defendants in the cases addressed above, Genco did not quickly accept responsibility, although she has done so now, and did not express an early intention to resolve the charges against her.  Genco's statements to Probation do not address remorse but do acknowledge her conduct and the disruption that she caused for police.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 10.

**Conclusion**

Sentencing requires the court to carefully balance the § 3553(a) factors.  Balancing these factors, the government recommends that this Court sentence Genco to 30 days of home confinement, 36 months of probation, 60 hours of community service, and $500 in restitution.  The month of home confinement and 36 months of probation will provide a degree of supervision that affords protection to the community, yet accounts for this defendant's relative lack of criminal history and culpability in what is nevertheless an unprecedented and serious offense. In light of this defendant's comparatively lesser role in the offense and acceptance of responsibility, and in

28

light of how she compares with other defendants, the recommended sentence will promote respect

for the law.  Accordingly, this Court should impose the sentence recommended herein.

<div style="margin-left: 40%;">

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:  s/Karen Rochlin
Karen Rochlin
Assistant United States Attorney Detailee
DC Bar No. 394447
99 N.E. 4th Street
Miami, Florida 33132
(786) 972-9045
Karen.Rochlin@usdoj.gov

</div>

29

## <u>CERTIFICATE OF SERVICE</u>

On September 12, 2022, a copy of this memorandum was served upon all parties listed on the Electronic Case Filing (ECF) System.

<u> s/*Karen Rochlin*</u>
Assistant United States Attorney Detailee