**UNITED STATES DISTRICT COURT§§**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | **CASE NO. 1:22-CR-0062 (JMC)** |
| **v.** | § | |
| | § | |
| **RAECHEL GENCO**, | § | |
| **Defendant.** | § | |

**DEFENDANT'S REPLY SENTENCING MEMORANDUM**

Defendant, Raechel Genco, by and through her attorney, Barbara W. Palmer, respectfully submits this her reply to the United States Government's sentencing memorandum. Defendant respectfully requests, after considering all the relevant sentencing factors, included in 18 U.S.C. § 3553(a), that the Court impose a sentence that is largely reflective of the Government's sentencing recommendations made in its sentencing memorandum. While acknowledging the Government's careful attention to the details of this specific case, and its application of statutory and case law guidance to its sentencing recommendations, Defendant would respectfully request this Court review additional factors, stated below, and prays that this Court exercise sound discretion in the sentencing of her case. Defendant, through her attorney, has been advised that this Court will be filing written reasons to substantiate the penalties that this Court imposes.

### I.    Sentencing Factor Under 18 U.S.C. § 3553(a)

As stated in the Government's memorandum, this petty misdemeanor case is guided by 18 U.S. C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Those factors include:

1)  The nature and circumstances of the offense §3553(a)(1);

2)  The history and characteristics of the defendant; *Id.*

1

3) The need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A);

4) The need for the sentence to afford adequate deterrence, § 3553(a)(2)(B), and

5) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, §3553(a)(6).

In considering the above list of factors, the Government states in its Sentencing Memorandum that "there is possibly no greater factor that this Court must consider" than the factor of general deterrence. *Document 69, page 7.*  Through this and similar sentencing memorandums in other cases, the Government points to "the violent riot" and the need to deter "future would-be rioters" from similar actions.  Further, the Government states:

> "General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have the peaceful transfer of power to a newly elected President".

The Government goes on to say that "it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy."  While the Government acknowledges that each defendant should be sentenced based on his or her individual conduct, its sentencing memorandum is packed with specifics that are either the conduct of others in the crowd or the ordinary or protected political speech of unidentified individuals or defendants in other cases. Defendant would request that this Court base the sentencing in this case on only factors that are within the proper statutory framework of §3553 and only as those factors related to her specific conduct.

I.      **DEFENDANT DOES NOT SUPPORT ANY IDEOLOGY THAT THE GOVERNMENT BELIEVES MOTIVED THE JANUARY 6TH RIOT.**

Defendant does not support any political or non-political ideology that the Government may be insisting motived some individuals to riot on January 6th.  Her sentencing, therefore, has no effect on any future deterrence of similar violence.   While there are other cases associated with the day January 6, 2021, that may involve accusations of other defendants' involvement in domestic terrorism, militia groups, left-wing groups, right-wing groups, or other extremist-type groups that are of concern to federal law enforcement agencies, this Defendant is not a part of any of any group that promotes the use of violence to achieve a political end.  No evidence supports that Ms. Genco was or is a member of any group that utilizes violence as a tactic to achieve social change.  The Government, therefore, has no real concerns about a need for community protection or perceived offender dangerousness in this case and, therefore, no punishment need be assessed using that reasoning.

As to a specific deterrence, since March 19, 2021, Ms. Genco has been ordered to participate in a location restriction program with a curfew of 10 p.m. to 8 a.m.  She has also been ordered and submitted to location monitoring.  *Document 8, page 2, (7)(p) & (q).*  Pre-trial services reports indicate that Defendant has complied with her supervising officer requests.  Defendant would respectfully request the Court to review the pre-trial services reports showing that she has been on monitoring for 19 months, and consider a minimum length of probation, as more closely fits the charges and circumstances of this case.  Defendant respectfully suggests, having been on a curfew for 19 months, any assessment of a punishment of home detention is unnecessary and serves no purpose. Defendant has no prior record of criminal offenses.

If the Government is attempting to infer that the violence at the Capital on January 6th was a result of group extremism, left-wing or right-wing, Defendant respectfully asserts that that

3

inference has no place in this case.  The FBI recognizes violent extremism as type of political crime, defining it as "encouraging, condoning, justifying, or supporting the commission of a violent act to achieve political, ideological religious, social or economic goals."  This language does not seem to appear to be a part of any charging statute and was never a consideration in this case.  Instead of bringing this case into a federal court, the charges could just as easily have been filed in a municipal court, where punishment ranges would be considerably less.

This case started as charges under 18 U.S.C. §1752(a)(1) and (2), both class A misdemeanors, both connect to conduct within a restricted area where the Vice President is in proximate location, a federal nexus.  Defendant, through her attorney, asserts that the Government would have been unable to obtain convictions on these charges, as Defendant did not enter the Capitol building and was nowhere in proximity to the Vice President and, therefore, was not a threat to him or his staff.  While the plea agreement did act to lower the level of the charge and potential punishments, the agreement also brought this case into a more suitable charge as to Defendant's conduct.  Delays in providing and acceptance of any plea offers should just as easily be attributed to the cumbersome discovery process that the Government has put all defense counsel through.  Negotiation of a plea agreement, without viewing the case's Brady materials and discovery, could amount to ineffective assistance of counsel.

The Government assertion that Defendant holding a furled or unfurled flag with a picture of a fictional Hollywood character would somehow add to any violent action of that day is foolish. There is no evidence that any individual present on the Capitol grounds that day paid any attention to Ms. Genco's actions.  Of note, there is no evidence that Ms. Genco had any significant interactions with police officers, although she was near several of them.  *See, Texas v. Johnson*, 491 U.S. 397 (1989)("No reasonable onlooker would have regarded Johnson's

generalized expression of dissatisfaction with the policies of the Federal Government as a direct

personal insult or an invitation to exchange fisticuffs").



(Picture taken from open source showing crowds, many carrying various flags, at mid-morning around the Ellipse.

https://rumble.com/v1029gr-more-tpc-video-from-january-6-2021.html. )[1]

There is no evidence that any police officer issued a standard "trespass warning".  It is

unlikely that Ms. Genco was able to hear or heard any "riot warning" or announcements that are

believed to have occurred on the West side of the Capitol Building at about 2:30 p.m. on that

day.[2]

---

[1] https://rumble.com/v1029gr-more-tpc-video-from-january-6-2021.html.  This link contains an open-source video that contains intermittent timestamps.  The video starts from mid-morning of January 6th.  It runs for approximately 1 hour.  The video shows a greater perspective of views of times relevant.  This video shows various aspects of the build up between individuals, other than Defendant, and local law enforcement. Riot warnings can be heard in this video.

[2] Reference Government video – LWG-011-00000001 – provided by AUSA to Defendant's attorney on June 17, 2022.

There is no evidence of financial support for her activities on January 6th, and the Government has properly noted that Defendant did not go into the Capitol building, as did some defendants listed on Government's Exhibit 1 that are used as comparison cases. *Document 69-1, page 1, Table 1: Cases in which the government recommended a probation sentence without home detention*.

The Government now appears to contend that "although those like Genco convicted of misdemeanors are generally less culpable than defendants convicted of felonies, misdemeanor breaches of the Capitol on January 6, 2021, were not minor crimes." The Government appears to assert that some increase in punishment is justified as a specific deterrence. In one sentence, the Government complains that Defendant didn't enter a plea agreement fast enough, and in a different sentence, states that she deserves no consideration for admission of responsibility for her actions. Defendant would respectfully request this Court to note that the last piece of relevant evidence, used to produce the still pictures in Government's Sentencing memorandum, was produced on June 17, 2022. Discovery was presented to defense counsel through a proprietary online system, and, at last view, had over 83,000 documents.

## II.   DEFENDANT DID NOT GO TO D.C. EXPECTING TO FIND HERSELF IN THE MIDDLE OF A HOSTILE CROWD.

Defendant did not start her day on January 6th intending to go to a riot. The evidence indicates that she was going to what could be described as a social gathering, prayer vigil, or rally, even more than a protest. The activities that day started as a festival, may have turned into a protest for some, and ended as a riot by the actions of others. The mass media and internet coverage of the January 6th events has distorted, and continues through today to distort, the actions of individuals who were standing in various locations around the public grounds in D.C.

that day.  As the Government has chosen to include multiple references to events that this Defendant did not witness, and conduct that this Defendant did not participate in, Defense counsel presents, herein, a summary of a different view of January 6, 2021.

A "protest" can be defined as a peaceful, public display of disapproval or displeasure carried by chanting and marching in public.  A protest becomes a "riot when the expression of that displeasure becomes violent and results in personal injury and destruction of property.

Discovery does clearly indicate that the Capitol Police, along with various other local law enforcement agencies, were fully aware of the various groups that would be present at the Capitol grounds on January 6, 2021.   Discovery provided by the Government also shows that there were multiple law enforcement processes and procedures that took place well before January 6, 2021.  The activities were in preparation for the size of crowds that would be in



Still pictures taken from the same video utilized in the Government Sentencing Memorandum.  These are included under the evidentiary rules of optional completeness.



attendance on that day.  Multiple citizens groups sought authorization, through the United States Department of the Interior, for use of National Park System grounds around the national Capitol region for their scheduled events and demonstrations.  *See generally, 36 C.F.R. § 7.96(g); Government Discovery DOJCB_005, CAPD_000001121 through CAPD_ 000001139, CAPD_0001691 through CAPD0001767, labeled as Permits. ("Permits").*

Discovery also shows that Metropolitan Police Department ("MPD"), Homeland Security Bureau Special Operations Division, prepared a ninety-six (96) page manual entitled "First Amendment Demonstrations", subtitled for Monday, January 4 through Thursday, January 7, 2021, last updated January 3, 2021, and signed off on by the Chief of Police, Robert J. Contee, III.  *Government Discovery, CAPD_000001171*. This Report contains a wealth of information about procedures, both regular and special, that MPD department took to ensure the safety of the public and the safety of those present.

The MPD Report clearly indicates that the Metropolitan Police Department regularly handles similar events and were aware of the totality of possible law enforcement issues that could be created by these events on these days.  The Executive Summary in the Report discusses a number of demonstration events, beginning November 13, 2020, that "attracted counter-protesters resulting in several fights between the groups" because the elections of November 3, 2020 were "contested, with many still arguing the election was fraught with fraud".  *Report. p. 4.* The Report also states:

> "Due to these well-advertised demonstrations, counterdemonstrators have announced their intentions to protest and confront the groups.  Open-source information has postings from groups to counter any pro-Trump effort in Washington, DC.". *Id.*

The Report goes on to state that:

> "The objective of MPD is to assist with the safe execution of any First Amendment demonstration (emphasis added) and ensure the safety of the participants, public, and the officers.  CDU personnel and SOD members will monitor for any demonstration and/or violent activity and respond accordingly." *Id. p. 5.*

Review of the multiple video clips and police body camera footage produced by the Government would indicate that this was exactly what the local law enforcement, along with assistance from other states' law enforcement officers, did. The officers were attempting to balance First Amendment rights and provide for the safety of the public, on January 6, 2021. The MPD was aware of the issues faced from its prior recent experiences.  The Report states:

> "Leading up to this point, the political season has been controversial due to protests and riots related to George Floyd's death, the COVID pandemic, and other continuing

9

First Amendment demonstrations. Due to the increased First Amendment activity and the potential for violence, MPD has developed the following plan for the time period from Monday, January 4, 2021 through Thursday, January 7, 2021."

After January 6, 2021, all investigations of incidents of criminal conduct appear to have been turned over to the Federal Bureau of Investigation ("FBI"). The charges by information in this case appear to be a result of post-event FBI investigations, sparked by hot line tips.

All events or rallies on those days began classified by police as First Amendment "demonstrations" or "protests" according to the official Report issued by MPD, thus making them subject to First Amendment protections. This fact would explain local law enforcements actions in allowing the crowds to advance onto the Capitol grounds and remain there for about 1 ½ hours, until about 2:30 p.m. As of that time, there were no citizens on the upper plaza area of the West side of the Capitol building, only police officers. *See,* *https://rumble.com/v1029gr-more-tpc-video-from-january-6-2021.html*. Police officers in riot gear appeared at about 2:15 p.m. and officers began the use of various devices to attempt to scatter the crowd on the lower level of the plaza. *See, Government video – LWG-011-00000001 referenced above*. At this time, there were no citizens on the upper West side Capitol Plaza area, only police officers.

Defendant believes that review of the relevant factors will lead the Court to a reasonable decision as to punishment.

## **CONCLUSION:**

For the reasons stated above, Defendant, Raechel Genco, respectfully accepts responsibility for her actions in this matter, and requests this Court to impose a sentence that the Court feels is just and fair, taking into consideration the Government's recommendations, and all factors the Court, in its discretion, deems appropriate. Defendant would respectfully suggest that

a period of 12 months of probation, 60 hours of community service, and assessment of the agreed

to $500 in restitution payable to the Architect of the Capitol would be appropriate.


Respectfully submitted,

_/s/_ *Barbara W. Palmer*

Barbara W. Palmer
Attorney at Law
TX Bar No. 15424395
P.O. Box 1386
Princeton, TX  75407
Tel. No. (214) 734-1861
Email: bpalmer.txag@gmail.com

ATTORNEY FOR RAECHEL GENCO


## CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of September 2022, a copy of the foregoing

Defendant Reply to Sentencing Memorandum, was delivered to case registered parties by the

CM/ECF court system.


_/s/_ *Barbara W. Palmer*

Barbara W. Palmer